2026 IL App (1st) 241703-U

No. 1-24-1703

Order filed May 21, 2026

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23 CR 3044 |
| | ) | |
| JOHN MUNOZ, | ) | Honorable |
| | ) | Michael R. Clancy, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE NAVARRO delivered the judgment of the court.
Justice Quish concurred in the judgment.
Justice Ocasio dissented.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction for criminal sexual assault where there was sufficient evidence to convict him of the offense and any alleged error in the trial court denying his pretrial motion to suppress would have been harmless.

¶ 2    Following a jury trial, defendant John Munoz was found guilty of one count of criminal sexual assault and sentenced to eight years' imprisonment. On appeal, Munoz contends that (1) there was insufficient evidence to convict him of the offense where the State failed to prove he committed an act of sexual penetration and (2) the trial court erred in denying his pretrial motion

to suppress inculpatory statements he made to the police where he unequivocally invoked his right to remain silent before making those statements yet the police continued to question him. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      A grand jury indicted Munoz with five counts of various sex offenses that he allegedly committed against the victim, K.C., from August 2019 through July 2022. Count 1 alleged that Munoz committed predatory criminal sexual assault of a child based on K.C. being under 13 years of age at the time. Counts 2 through 5 alleged that Munoz committed criminal sexual assault based on K.C. being a family member of his and under 18 years of age. As relevant to this appeal, in Count 3, the State alleged that, between July 1, 2020, and June 30, 2021, Munoz knowingly committed an act of sexual penetration upon K.C. by making contact between his sex organ and her anus. As the case proceeded, Munoz filed a motion to suppress inculpatory statements he made to the police. Although Munoz conceded that he received his *Miranda* warnings, he argued that he did not knowingly and voluntarily waive them.

¶ 5                                    A. Pretrial Hearings

¶ 6      At the suppression hearing, through the testimony of Chicago Police Detectives Ryan Goldie and Susana Rickher, the evidence revealed that shortly after his arrest on February 21, 2023, Munoz was transported to a Chicago police station. Munoz indicated to the lead detectives on the case, Detectives Goldie and Melissa Rodriguez, that, while he understood some English, he did not speak it fluently. As a result, the detectives enlisted Detective Rickher to act as Munoz's interpreter. While Munoz was in the interview room, the detectives spoke to him three times.

¶ 7      Prior to the first time, Detective Rickher informed Munoz of his *Miranda* rights, and he indicated that he understood each right. The detectives then spoke to Munoz for approximately 30

minutes and exited the interview room. When the detectives returned a little less than an hour later, Detective Rickher informed Munoz that Detectives Rodriguez and Goldie were going to ask him more questions. Detective Rickher reminded Munoz that he could stop talking and ask for an attorney, which Munoz acknowledged understanding. The detectives spoke to Munoz for approximately an hour and then, once again, left the interview room. Up until that point, Munoz denied having sex with K.C.

¶ 8     When the detectives returned approximately an hour later, Detective Rickher reiterated to Munoz that he could stop talking by asking for an attorney, which Munoz indicated he understood. Detective Rickher confirmed that Munoz could stop talking to the detectives or ask for an attorney, which he again stated he understood. Detective Goldie then asked Detective Rickher if Munoz agreed to continue talking, and Detective Rickher relayed that question to Munoz. In response, according to a transcript of Munoz's interview, which was admitted into evidence, Munoz stated: "I have nothing to say anymore, but, well no." In turn, Detective Rickher told the other detectives that Munoz "doesn't feel like he has anything left to say." Nevertheless, Detective Rickher asked Munoz if it was okay if they asked him more questions to which Munoz replied "yes." Detective Rickher told the other detectives that Munoz was "okay with [them] asking questions," but that "he doesn't feel like he has anything else." The detectives continued to question Munoz, and as they discussed the allegations K.C. made against him, Munoz again denied having sex with K.C. Upon further questioning, however, he admitted to having unspecified sexual conduct with her twice, though he claimed that she initiated it. Munoz continued to provide additional details about his sexual encounters with K.C.

¶ 9     Following the testimony of Detectives Goldie and Rickher, Munoz testified that he was 23 years old at the time of his interview. He worked in a metal factory, where he spoke to colleagues

in both English and Spanish. Munoz asserted that he had never been arrested before, never been interrogated before, and knew nothing about police procedure. Although Munoz acknowledged that Detective Rickher told him he had the right to stop talking and he understood that right, he explained that he continued talking because he "thought that [he] had to continue talking."

¶ 10    During Munoz's argument, his attorney did not argue that his *Miranda* waiver was not knowingly and voluntarily made, as he did in his written motion. Instead, he contended that, when he told the detectives that he had nothing more to say, he had explicitly invoked his right to remain silent, which the detectives did not honor. Following argument, the trial court found that Munoz did not unequivocally invoke his right to remain silent when he told the detectives that he had nothing left to say because he answered affirmatively when Detective Goldie asked if they could ask him more questions. The court accordingly denied Munoz's motion to suppress.

¶ 11    As the case neared trial, the State filed a motion for a hearing under section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2020)). For purposes of this appeal, section 115-10 allowed for the admission of out-of-court statements made by an alleged victim of a sex offense, who has a developmental disability, describing the acts committed against her, but only after a hearing where the trial court finds sufficient indicia of reliability of the statements and the individual testifies at trial. Pursuant to section 115-10, the State sought to admit statements K.C. made to Gianna Casali, a nurse practitioner at Ann & Robert H. Lurie Children's Hospital of Chicago, Kelly Medina, a supervisor with the forensic interview team at Chicago Children's Advocacy Center, and Mayra Davila Gutierrez, K.C.'s aunt. The State also filed a motion *in limine* to admit K.C.'s statements to Casali under section 115-13 of the Code (*id.* § 115-13), which provided an exception to the hearsay rule for statements made by victims of sex offenses to medical personnel. Following a hearing, the trial court found K.C.'s statements to

Casali, Medina and Gutierrez admissible under section 115-10. The court also found K.C.'s statements to Casali admissible under section 115-13. Prior to trial, the State dismissed Count 2.

¶ 12                                    B. Jury Trial

¶ 13    The case advanced to a jury trial, where K.C., now 17 years old, testified that Munoz was her cousin, and they met when she was in sixth grade, around 11 or 12 years old. Munoz came to live with K.C.'s family in Chicago in their two-bedroom apartment, where she shared a bedroom with her sister. Meanwhile, Munoz slept in a storage room that was converted into a bedroom. Frequently, K.C. would go into Munoz's bedroom to watch his television or play his PlayStation. Sometimes, K.C. would lie on Munoz's bed while he was there. One time, as K.C. was lying on Munoz's bed wearing just underwear, she noticed Munoz take off his pants, though keeping his underwear on, and felt his penis touch her "butt." Another time, while K.C. was on Munoz's bed and wearing clothes, she felt Munoz take his pants off and then felt his penis touch her "butt." K.C. described Munoz as "wiggling" and "moving" his penis on her. K.C. testified to a third instance, where Munoz touched her vagina with his fingers. However, K.C. did not provide a date as to when Munoz made sexual contact with her.

¶ 14    At trial, the State repeatedly asked K.C. how often Munoz touched her. While she asserted that Munoz continued to have sexual contact with her until her family moved out of their apartment around K.C.'s freshman or sophomore year of high school, she only could describe the frequency as "[l]ike a week" or "sometimes." Other times, K.C. responded that she did not know how many times it occurred. K.C. likewise could not remember when the last sexual contact occurred.

¶ 15    On December 25, 2022, K.C. was at a family member's house when, according to K.C., her cousin, Chris, asked her if someone had been "touching" her. K.C. responded affirmatively. Gutierrez, Chris' mother and K.C.'s aunt, heard K.C. state that Munoz " 'raped' " her. When K.C.

said this, according to Gutierrez, she was crying and hysterical. Gutierrez did not ask any follow-up questions. Instead, she hugged and consoled K.C. Gutierrez then brought K.C. to Gutierrez's house so they could have a private conversation. There, Gutierrez called her cousin, who was married to a Chicago police officer, to find out what to do. After talking with the officer, Gutierrez attempted to ask K.C. questions, but K.C. had difficulty understanding the questions. Gutierrez ascribed this difficulty to K.C. not having the mental capacity of someone her age. Gutierrez explained, at trial, that K.C. had an individualized education program at school and while she was 17 years old, her mental capacity was more like a 9- or 10-year-old. Still, Gutierrez testified that K.C. was "pretty good" at recalling dates.

¶ 16    Eventually, during Gutierrez's conversation with K.C., she said that Munoz's contact with her began as tickling, but escalated into sexual contact. When Gutierrez asked K.C. when Munoz last "raped" her, K.C. responded that it occurred two weeks earlier, or around December 9, 2022, after K.C. had just turned 15 years old. According to Gutierrez, K.C. told her that K.C.'s father was using the television in the living room, so she went into Munoz's room, who was not there, to watch television. As she was lying on his bed, she started to fall asleep when Munoz entered the room, closed the door and laid "down behind her." K.C. then felt Munoz "pulling down her pants and her underwear," and then felt him place his penis inside of her.

¶ 17    The next day, Gutierrez took K.C. to Ann & Robert H. Lurie Children's Hospital of Chicago. There, Casali, who had special training for interviewing children, including a certification for being a sexual assault nurse examiner, evaluated K.C. Casali asked K.C. why she was there, and K.C. responded because " '[Munoz] raped me.' " K.C. told Casali that the inappropriate contact began in sixth grade with simple tickling that became more serious over time. Casali continued to ask more questions, and K.C. told her that the contact progressed to Munoz

touching her breasts and eventually, "put[ting] his penis inside of her," both vaginally and anally. K.C. revealed to Casali that the incidents occurred weekly when K.C.'s parents would go to the store, and the last sexual contact occurred in late November 2022.

¶ 18    About a week later, Gutierrez took K.C. to the Chicago Children's Advocacy Center, where Medina, who had specialized training in interviewing children raising allegations of abuse, interviewed K.C. During the interview, K.C. remarked that she moved away from her old home "because she was raped" by Munoz. According to Medina, K.C. "struggled" to give a sequence of events, meaning she "was having a hard time using [her] words" and "express[ing] what had happened." To this end, K.C. could not provide Medina specific dates, but told Medina that the sexual contact with Munoz began while she was in sixth grade and continued until around Christmas 2022. K.C. was able to tell Medina where the sexual contact occurred on her body by using diagrams of the male and female anatomy. Medina's interview with K.C. was video recorded, and portions of that interview were played for the jury and entered into evidence.

¶ 19    In the video played for the jury, K.C. was reluctant to talk and had difficulty answering Medina's questions, frequently pausing for long periods of time and fidgeting, and telling Medina that she could not remember. K.C. did tell Medina that Munoz's contact with her began with tickling and escalated. After telling Medina that Munoz had "raped" her, Medina asked what K.C. meant by the term "raped." K.C. initially struggled to explain what she meant, but eventually, she described various incidents, albeit without much detail. First, K.C. told Medina that, while she and Munoz were lying on his bed, he took off his pants and her pants, and then "put it in." Although K.C. initially said that she was wearing underwear, she later revealed that Munoz took them off before he made sexual contact with her. While following up with K.C., Medina attempted to obtain more details about how Munoz "tried to put it in" her. K.C. explained that Munoz tried to put it in

her from behind, but eventually gave up. Because K.C. was struggling to open up and name the relevant body parts, Medina obtained diagrams of the male and female anatomy.

¶ 20    Using those diagrams, Medina asked K.C. if anyone had done anything to her body, including her vagina and butt. In response, K.C. stated that Munoz once put his fingers on her vagina, which she believed occurred while she was in seventh grade. Initially, K.C. denied that anyone had done anything to her butt. However, after Medina asked K.C. questions about the male anatomy using the diagram and Medina reminded K.C. about the earlier incident involving Munoz taking off her pants, K.C. pointed to the female butt in the diagram as to where Munoz touched her with his penis. Upon Medina asking how that felt, K.C. remarked that it felt "weird" on "the hole" of her butt and that Munoz's body was "moving *** in and out." K.C. believed the incident occurred when she was going into eighth grade. K.C. added that Munoz put his penis in her butt more than one time, but she could not remember the last time it occurred.

¶ 21    On February 21, 2023, Chicago police officers arrested Munoz, who was 23 years old at the time, and transported him to a police station. There, Detectives Rodriguez and Goldie interviewed Munoz three times over the course of the day. Because Munoz primarily spoke Spanish, Detective Rickher acted as Munoz's interpreter, though Munoz was able to understand parts of the detectives' questioning in English. During the testimony of Detective Rickher, the State introduced and entered into evidence the video recording of Munoz's interview along with a transcript of his answers translated into English. That recording was played for the jury.

¶ 22    In the video, Munoz acknowledged that K.C. was 16 years old and initially denied anything occurred between them, insisting that she was lying. Upon further questioning, Munoz asserted that there had been physical contact between the two in his bedroom, where K.C. sometimes came to watch television, but it was K.C. who initiated it. Munoz described two instances, one

approximately three years earlier and another approximately one year earlier, where K.C. grabbed his private areas. After both instances, Munoz kicked K.C. out of his room. Another time, according to Munoz, K.C. asked him to have sex, but he refused because they were family.

¶ 23    Later, Detective Rodriguez instructed Detective Rickher to tell Munoz that he was about to be taken to lockup and that it was his last chance to give his side of the story, including if it was K.C. that initiated the sexual contact. Immediately after, Munoz admitted that he and K.C. had sex twice after K.C. initiated it, though he did not specify the kind. Munoz noted that he wore a condom, and he believed the second time occurred around June or July 2022 and the first time occurred approximately six months earlier. As Munoz described one of the incidents, he told the detectives that he went inside her body "[a] little bit." Although, according to the transcript, Munoz never used the word vagina, Detective Rickher, translating for Munoz, told the other detectives that Munoz inserted his penis into K.C.'s vagina. When describing one of the incidents, Munoz did state that K.C. "was on her side" and "in front."

¶ 24    Following the testimony of Detective Rickher, the State rested. In the defense's case, Franco Valle, Munoz's cousin, testified that he had lived with Munoz for approximately 18 months. Valle knew Munoz to be compassionate, generous and truthful. Munoz testified that he was arrested between 8 and 9 a.m., and stayed in the interview room for about eight or nine hours. During his time in the room, the detectives came in multiple times asking him the same questions over and over. Munoz explained that he eventually admitted to having sex with K.C. after initially denying it because he thought the detectives "would leave [him] alone" if he admitted to having sex. Munoz did acknowledge that, on two occasions, K.C. touched him inappropriately. But he denied having sex with K.C., reiterating that he admitted to it to stop the questioning.

¶ 25    After Munoz's testimony, the defense rested. In the State's rebuttal case, it entered into evidence a stipulation that, if Detective Rickher were to testify again, she would have testified that Munoz was allowed to eat food, have something to drink and use the bathroom while in custody. Detective Rickher would have further testified that Munoz was questioned for approximately two hours while in custody and given *Miranda* warnings three times.

¶ 26    Following closing arguments, the jury found Munoz not guilty of predatory criminal sexual assault of a child (Count 1), which was based on contact between his fingers and K.C.'s vagina, and two counts of criminal sexual assault (Counts 4 and 5), which were based on two separate instances of contact between his penis and K.C.'s vagina. However, the jury found Munoz guilty of one count of criminal sexual assault (Count 3) based on contact between his penis and K.C.'s anus. Munoz filed a motion for new trial, which did not include any argument about the trial court's denial of his motion to suppress. The court subsequently denied his motion and sentenced him to eight years' imprisonment.

¶ 27    This appeal followed.

¶ 28                                    II. ANALYSIS

¶ 29                          A. Sufficiency of the Evidence

¶ 30    Munoz first contends that the State failed to prove his guilt beyond a reasonable doubt where K.C. did not testify at trial to any exposed penis to anus contact, which was required to sustain his conviction on Count 3, and the remaining evidence presented by the State was insufficient to remove all reasonable doubt of his guilt.

¶ 31    When a defendant challenges the sufficiency of the evidence against him, we must determine whether, when the evidence is viewed in the light most favorable to the State, a rational trier of fact could have found the elements of the offense proven beyond a reasonable

doubt. *People v. Woods*, 2023 IL 127794, ¶ 56. Under this standard of review, we must make all reasonable inferences from the evidence in the State's favor. *People v. Harvey*, 2024 IL 129357, ¶ 19. Additionally, under this standard, the trier of fact has the responsibility "to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." (Internal quotation marks omitted.) *People v. Jackson*, 2020 IL 124112, ¶ 64. Given this deference, the reviewing court does not retry the defendant, and thus, we do not substitute our judgment for that of the trier of fact on issues affecting the credibility of witnesses or the weight of the evidence. *Id.* We will not reverse a defendant's conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Id.*

¶ 32     To convict Munoz of criminal sexual assault under Count 3, the State had to show that he committed "an act of sexual penetration" on K.C., and K.C. was a family member of his and under 18 years of age. 720 ILCS 5/11-1.20(a)(3) (West 2020). Although in Count 3, the State alleged that the sexual penetration was contact between Munoz's sex organ and K.C.'s anus, "the type of sexual penetration is not an element of the offense, and its inclusion in the indictment is merely surplusage." *People v. Olivieri*, 334 Ill. App. 3d 311, 317 (2002). In turn, "[t]he State need only prove that a type of sexual penetration occurred beyond a reasonable doubt." *Id.*

¶ 33     In challenging the sufficiency of the evidence against him, Munoz does not contest that K.C. was a family member of his or she was under 18 years of age at the relevant time. Rather, his challenge to the sufficiency of the evidence is based on the State allegedly failing to prove "an act of sexual penetration." The term "[s]exual penetration" is defined as:

"any contact, however slight, between the sex organ or anus of one person and an object or the sex organ, mouth, or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex

organ or anus of another person, including, but not limited to, cunnilingus, fellatio,

or anal penetration. Evidence of emission of semen is not required to prove sexual

penetration." 720 ILCS 5/11-0.1 (West 2020).

Given its definition, "[s]exual penetration" consists of two categories of conduct: "contact" and "intrusion." (Emphasis omitted.) *People v. Maggette*, 195 Ill. 2d 336, 346-47 (2001).

¶ 34  Based on this definition, Munoz asserts that, in order to prove him guilty on Count 3, the State had to prove his penis penetrated K.C.'s anus, however slight. But Munoz's argument ignores that our legislature has defined "[s]exual penetration" more broadly than the common and ordinary meaning of the term. See *id.* As counterintuitive as it may sound, penetration, or intrusion, is not required to prove "[s]exual penetration." See 720 ILCS 5/11-0.1 (West 2020). Rather, as discussed, "[s]exual penetration" also includes "any contact, however slight, between the sex organ or anus of one person and an object or the sex organ, mouth, or anus of another person." *Id.* And, as noted, the type of sexual penetration committed by the defendant is not an element of the offense, and the State need only prove beyond a reasonable doubt that a type of sexual penetration occurred. *Olivieri*, 334 Ill. App. 3d at 317.

¶ 35  With the definition of "[s]exual penetration" established, we turn to the instant case, where K.C. testified to two instances of Munoz touching her "butt" with his penis. The first instance occurred when she and Munoz were both wearing underwear. The second instance occurred when she had clothes on, and Munoz apparently was not wearing any clothes. While sexual penetration can be established through contact (see 720 ILCS 5/11-0.1 (West 2020)), K.C. never testified that Munoz made contact with her anus. See *People v. Nibbio*, 180 Ill. App. 3d 513, 517 (1989) (positing that sexual contact with an alleged victim's " 'buttocks' " does not constitute sexual contact with the alleged victim's " 'anus' ").

¶ 36    Nevertheless, to prove Count 3, the State did not solely rely on the testimony of K.C. The State also presented testimony from Casali, the nurse practitioner who treated K.C., and Medina, the forensic interviewer who interviewed K.C., who both testified that K.C. told them that Munoz put his penis inside her butt, thereby establishing intrusion into the anus of K.C. and contact with her anus. Furthermore, Gutierrez testified that, during K.C.'s outcry, K.C. reported that, in early December 2022, Munoz laid down on his bed behind her, "pull[ed] down her pants and her underwear," and then, she felt him "inside her." While Gutierrez never specifically testified to anal intrusion or contact, it is reasonable to infer given that Munoz was behind her. See *Harvey*, 2024 IL 129357, ¶ 19 (all reasonable inferences must be made in favor of the State). As a result, contrary to Munoz's assertions on appeal otherwise, the jury could rationally infer that Gutierrez's testimony also established contact between Munoz's penis and K.C.'s anus, and intrusion of his penis into her anus. While K.C. reported to Gutierrez that this occurred in early December 2022 and Count 3 alleged conduct occurring between July 2020 and June 2021, "[t]he date alleged in the charging instrument ordinarily need not be proved precisely and any irregularity between the indictment and proof establishing the offense was committed on a date other than that precisely alleged is not a fatal variance." *People v. Smith*, 337 Ill. App. 3d 819, 824 (2003). And thus, though K.C. never testified to contact between Munoz's penis and her anus, or intrusion of his penis into her anus, Casali, Medina and Gutierrez all testified that he committed an act of sexual penetration.

¶ 37    Despite the testimony of Casali, Medina and Gutierrez, Munoz argues that Casali and Medina's testimony was hearsay, not subject to cross-examination, and contradicted by the testimony of K.C. Although this argument could apply to Gutierrez as well, because Munoz is adamant that she never testified to penis-to-anus sexual penetration, Munoz focuses on the testimony of Casali and Medina. It is undisputed that K.C. never testified to Munoz putting his

penis inside her anus, but it is not surprising that the most detailed and damning evidence against Munoz came from the testimony of Casali and Medina, and not K.C.

¶ 38    " 'It is well known that child witnesses, especially the very young, often lack the cognitive or language skills to effectively communicate instances of abuse at trial [citation], or may be impeded psychologically in their efforts to do so.' " *People v. Butler*, 2025 IL 130988, ¶ 36 (quoting *People v. Bowen*, 183 Ill. 2d 103, 115 (1998)). K.C. was a minor, and one with a developmental disability demonstrated by the evidence of her individualized education program at school and Gutierrez's testimony that K.C. had the mental capacity of someone several years younger than her actual age. Given K.C.'s age and developmental disability, it was reasonable to expect that she would have difficulty communicating Munoz's instances of sexual assault to strangers in his presence in a formal courtroom setting. See *People v. Foster*, 2020 IL App (2d) 170683, ¶ 42 (observing "[t]he jury may have reasonably concluded that during [the minor-victim's] testimony in a formal courtroom setting, in front of [the] defendant and many strangers, [she] had difficulty communicating the instances of abuse"). Conversely, both Casali and Medina testified to extensive training dealing with minors and allegations of abuse, meaning they have the formal training in how to discuss and extract allegations of sexual abuse with minors. It is logical that K.C. felt most comfortable with them, and they were able to obtain the most detailed and truthful account of Munoz's actions. In other words, K.C.'s inability to tell the jury that Munoz committed an act of sexual penetration, either contact or intrusion, of her anus, does not negate the testimony of Casali, Medina and Gutierrez, or create reasonable doubt of his guilt. See *id.* (finding that the minor's "inability to testify to or remember what happened with the pen does not negate the testimony of" a child-abuse investigator with the Kane County Child Advocacy Center and a pediatrician trained in child-abuse pediatrics).

¶ 39    As to Munoz's attempt to downplay Casali and Medina's testimony about K.C.'s statements to them as being hearsay and only admissible under section 115-10 of the Code (725 ILCS 5/115-10 (West 2020)), merely because it was hearsay does not mean it was not reliable. See *People v. Caffey*, 205 Ill. 2d 52, 88 (2001) (observing that the primary concern for hearsay evidence generally being inadmissible is its lack of reliability). Because K.C.'s statements to Casali and Medina were admitted under section 115-10, an exception to the general hearsay rule, the trial court already found after a hearing that K.C.'s out-of-court statements to Casali and Medina were reliable. See 725 ILCS 5/115-10(b)(1) (West 2020) (providing, in part, that to be admissible under this section, the trial court must find in a hearing "that the time, content, and circumstances of the statement provide sufficient safeguards of reliability"). Moreover, although K.C.'s statements to Casali and Medina were not subject to cross-examination, Casali and Medina themselves were subject to cross-examination at trial, and the jury was able to view K.C.'s interview with Medina and assess her credibility therein. As admissible evidence, it was the jury's responsibility to weigh what K.C. told Casali and Medina (and Gutierrez), compare those out-of-court statements to K.C.'s trial testimony, and resolve any inconsistencies therein. See *Jackson*, 2020 IL 124112, ¶ 64.

¶ 40    We agree with Munoz that a jury's determination on factual issues is not conclusive. See *People v. Smith*, 185 Ill. 2d 532, 542 (1999). But given what is known about minors testifying at trial (see *Butler*, 2025 IL 130988, ¶ 36), K.C.'s incapability at trial to substantiate the precise allegations under Count 3 did not render the evidence against Munoz so improbable or unsatisfactory such that it creates reasonable doubt of his guilt, especially given that Casali, Medina and Gutierrez all testified to contact between Munoz's penis and K.C.'s anus, and intrusion of his penis into her anus. See *Foster*, 2020 IL App (2d) 170683, ¶¶ 38-44 (affirming two convictions of predatory criminal sexual assault of a child over the defendant's challenge to the

sufficiency of the evidence despite, at trial, the minor-victim not accusing the defendant of sexual assault and not remembering many details asked of her because a child-abuse investigator with the Kane County Child Advocacy Center and a pediatrician trained in child-abuse pediatrics testified that the victim reported to them how the defendant sexually assaulted her). Consequently, the State presented sufficient evidence to convict Munoz on Count 3.

¶ 41                                    B. Motion to Suppress

¶ 42    Munoz next contends that the trial court erred by denying his motion to suppress. He highlights that, when he told the detectives that he had "nothing to say anymore," they did not honor his unambiguous invocation of his right to remain silent. As a result, Munoz posits that his subsequent admission to having sex with K.C. two times should have been suppressed.

¶ 43    Initially, the State argues that Munoz forfeited review of this contention by not raising it in his posttrial motion, which generally is required to preserve an issue for appellate review. See *People v. Jackson*, 2022 IL 127256, ¶ 15. However, under the constitutional exception to the forfeiture doctrine, when a constitutional issue is raised in the trial court and can be raised in a postconviction proceeding, the issue is not forfeited if the defendant fails to raise the issue in a posttrial motion. See *People v. Cregan*, 2014 IL 113600, ¶¶ 16-20. In turn, Munoz has not forfeited his suppression issue for appellate review.

¶ 44    We now turn to the merits of whether Munoz invoked his right to remain silent. Under both the United States and Illinois Constitutions, no one shall be compelled to provide evidence against himself in a criminal case. U.S. Const. amend. V; Ill. Const. 1970 art. I, § 10. To protect the accused's right against self-incrimination, before he can be custodially interrogated, he must be warned that: (1) he has the right to remain silent; (2) any statement he makes may be used against him; and (3) he has the right to the presence of an attorney, either appointed or retained. *Miranda*

*v. Arizona*, 384 U.S. 436, 444 (1966). After an individual has been given his *Miranda* warnings, if that "individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473-74. This remains true even if the accused initially answered questions from the police, as that fact "does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." *Id.* at 445. "[A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Id.* at 474. To invoke one's right to remain silent, he must do so unambiguously. *Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010).

¶ 45    Assuming *arguendo* that Munoz unambiguously invoked his right to remain silent, any error by the trial court in denying his motion to suppress would have been harmless. See *People v. Mitchell*, 152 Ill. 2d 274, 327 (1992) (observing that the harmless-error rule applies to confessions allegedly obtained in violation of the fifth amendment). "[T]o establish that an error was harmless, the State must prove beyond a reasonable doubt that the jury verdict would have been the same absent the error." *Woods*, 2023 IL 127794, ¶ 56. To determine if an error was harmless, one of the methods we may employ is to "examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction." *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008).

¶ 46    In the instant case, the uncontested, properly admitted evidence overwhelmingly supports Munoz's criminal sexual assault conviction. As noted, based on the testimony of Casali, Medina and Gutierrez, there were three witnesses who testified that K.C. told them Munoz committed an act of sexual penetration with her anus. While K.C. did not testify to sexual penetration of her anus, she did testify that Munoz used his penis to touch her butt on multiple occasions, including one time when he was "wiggling" and "moving" his penis on her.

¶ 47    In Munoz's statements to the detectives after allegedly invoking his right to remain silent, while he admitted to having sex with K.C. twice, he never expounded on the type of sex and only stated that he went inside her body "[a] little bit." While, according to the transcript, Munoz never said this occurred vaginally, Munoz did state that K.C. "was on her side" and "in front" when it occurred. And, in translating for Munoz, Detective Rickher told the other detectives that Munoz inserted his penis into K.C.'s vagina. As such, though Munoz's statements do provide general support that he and K.C. engaged in sex, due to the vagueness of his admissions, his statements do not directly support the allegations in Count 3. Because of this ambiguity, in conjunction with Casali, Medina and Gutierrez conclusively testifying that K.C. told them that Munoz committed an act of sexual penetration on her and K.C. providing reasonably similar testimony, the State proved beyond a reasonable doubt that the jury's verdict would have been the same had Munoz's inculpatory statements not been admitted at trial.

¶ 48    Nonetheless, Munoz highlights a note the jury sent to the trial court during its deliberations asking: "[D]oes sexual intercourse imply vaginal intercourse?" In response, the court told the jury that it had all of the evidence and the instructions, and to continue deliberating. Munoz posits that, based on this note from the jury, it is reasonable to conclude that his admission to having sex with K.C. twice contributed to the jury's decision to find him guilty. We do not agree, and we will not speculate as to the motives or reasoning behind a jury's question. See *People v. Spears*, 112 Ill. 2d 396, 409 (1986) (refusing to "metaphysically divine a jury's collective intent from a single question that may well have only embodied the curiosity or concern of a single juror").

¶ 49    Although our supreme court recently reiterated that, "because confessions are extremely probative, the improper admission of an unlawfully obtained confession rarely is harmless error," it still observed that it may be harmless "in certain circumstances." (Internal quotation marks

omitted.) *People v. Salamon*, 2022 IL 125722, ¶ 122. This is one of those rare cases in which an allegedly improper admission of a confession would be harmless given the testimony of Casali, Medina and Gutierrez, K.C.'s own testimony providing indirect support, and Munoz's inculpatory statements not directly supporting the allegations in Count 3. See *id.* ¶¶ 123-127 (finding that, even though a defendant's confession was involuntary and should have been suppressed, the erroneous admission of his confession was harmless because the substance of his "confession was cumulative and duplicated other evidence that was properly admitted at trial"). Consequently, we find any alleged error in the trial court's denial of Munoz's motion to suppress harmless.

¶ 50                                  III. CONCLUSION

¶ 51    For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 52    Affirmed.

¶ 53    JUSTICE OCASIO, dissenting:

¶ 54    Initially, I would find that by telling his interrogators that he had nothing else to say when asked if he was willing to speak to them again, Munoz clearly and unambiguously invoked the right to silence he had just been told he had. Hence, the officers' continued interrogation violated the fifth amendment. See *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). I would also find that the introduction of Munoz's compelled statements at trial was not harmless beyond a reasonable doubt.

¶ 55    In finding any error harmless, the majority posits that the evidence against Munoz overwhelmingly supported his conviction, but the jury—which acquitted him on four of the five charges—clearly thought otherwise. As to count 3 specifically, the only count that Munoz was found guilty on, the only clear evidence of anal penetration was K.C.'s statement to Kelly Medina that she felt his penis going into the "the hole" of her "bum," as opposed to the "two sides" or the

"line" shown on the anatomical picture Medina used. K.C's trial testimony, however, did not come close to establishing anal penetration. She testified that, on one occasion, Munoz put his penis against part of her buttocks that was covered by underwear; on another occasion, he wiggled and moved his penis against her "back part" while she was wearing pants. The remaining evidence was ambiguous. K.C.'s aunt, Mayra Gutierrez, testified that K.C. told her that Munoz had once laid down behind her and put his penis inside her, evidently not specifying whether it was vaginal or anal penetration. The nurse practitioner, Gianna Casali, testified that K.C. told her that Munoz had put his penis inside of her "[i]n the back, but also sometimes the front," leaving it uncertain whether "the back" referred to the anus or the intergluteal cleft, or even leaving open the possibility that he attempted vaginal penetration while positioned behind K.C. I am not suggesting that this evidence was insufficient or that the jury's finding of guilt was irrational, but that does not make it so overwhelming that we can say beyond a reasonable doubt the jury would have convicted regardless of Munoz's confession.

¶ 56    The majority also relies on the fact that Munoz's confession admitted only to acts of vaginal penetration, not anal penetration. While this makes some sense if you view a confession only in terms of the specific facts it contains, it overlooks that a defendant's confession can have an impact that goes beyond merely establishing those precise facts. Here, for instance, even though Munoz told police that he put his penis into K.C.'s vagina, the jury acquitted him on the two counts that charged that theory of criminal sexual assault, suggesting that it did not believe that he had actually performed those acts (which, notably, K.C. did not testify to or tell Medina about). But his willingness to admit to it might well have convinced them that *something* had happened, even if it was not precisely what he told police. In that sense, Munoz's admissions to police corroborated the basic theory that he had sexually assaulted K.C. in some way. It is conceivable that, had the

confession not been before the jury, it would have found that the State had not met its burden on count 3.

¶ 57    That being the case, I do not believe the State carried its burden of demonstrating to us beyond a reasonable doubt that the admission of Munoz's confession played no role in the finding of guilt. Accordingly, I would reverse Munoz's conviction and remand with instructions to grant the motion to suppress and to set the case for retrial.